15-1585 Kevin Smith v. City of Inkster et al. Orguments. 15 minutes for the plaintiff, 15 minutes to be shared by the defendants. Mr. Mark Granzato for the plaintiff appellant. Good morning. Mark Granzato on behalf of everybody. I have advised your clerk that I would like three minutes for rebuttal. Okay. You may proceed. This case comes on appeal from a district court decision dismissing a case on the basis of what I think is a very seriously wrong interpretation of Michigan preclusion law. Two aspects obviously of the preclusion law, race judicata and collateral estoppel. With respect to race judicata, there have been two prior pieces of litigation involving similar parties including the City of Inkster. One was a workers' compensation case, the second was a 2008 discrimination retaliation case for other retaliation and discrimination committed by the city against my client. In ruling in this case, the trial court first held that there was some sort of potential race judicata effect of the workers' compensation hearing. As I've indicated in my brief, race judicata in Michigan law is a question of basically compulsory joinder. As such, you can't compulsory join something where the court involved has no jurisdiction. I believe the defendants have conceded that the trial court erred when it decided that it could race judicata on the basis of what the workers' compensation magistrate did. There is no jurisdiction for a case like this in the workers' compensation department. Getting to the... It's a bad feeling between the plaintiff and the department here for many years. That's correct. It's been going on seven or eight years? I'm sorry? The problem has been going on now fighting back and forth. It never gets over. It just keeps going on. Well, when there are serial acts of discrimination and retaliation that impact the plaintiff, it will go on. I acknowledge this. You've got a judgment for $700,000? You've got a judgment for $700,000? Correct. That's the 2008 case. That's correct. Now, that was the other basis for the... Before you move on, workers' comp, I thought the Judge Drain applied collateral estoppel... Well, I was getting to that. ...rather than race judicata. I read it differently. That's why I briefed it the way I briefed it. Okay, but your argument as to collateral estoppel is that the heart condition was the only... That's correct. ...disability claim that was actually adjudicated and ruled upon, which is the basis for collateral estoppel. That is correct. As collateral estoppel, I acknowledge, a workers' compensation determination can, in fact, be collateral estoppel. Okay, would you concede, is your claim now for the retirement disability benefits limited to the psychiatric disability? No. Okay. Well, that's the only thing he's raised. That was the debate. I'm getting a little off my topic here. But the point is, that was the debate between these parties because, remember, the system required that there be competing doctors' viewpoints. It was totally unsympathetic. I thought his claim was both heart and psychiatric. And the heart thing had dropped out. Oh, it has dropped out. Okay. Well... Because I would think that the heart condition would be collaterally estopped by workers' compensation. No, I don't agree with that. Unless the condition has changed since the 2008... No, because it fundamentally misunderstands, in my opinion, the nature of a workers' compensation determination. Under Gose and Williamson and the Michigan Supreme Court, a workers' compensation determination is time-specific. It is... This magistrate found that as of November 2008, he was qualified to return to work. That is the finding. That is the binding finding. But when he moves in 2011 for a psychiatric-based disability pension, that is a very different question. His heart... Well, but he's not working after that, right? He has not worked since the day he got his... So his work history... All right. What I'm saying is I think that the workers' compensation ruling as to the heart condition may collaterally estop the disability pension claim, but the psychiatric claim, although it was raised, was not adjudicated and not ruled upon in the workers' comp. It was explicitly disavowed. On page 29... All you've got to do is agree with me. I agree with you on that. Because it was not ruled upon, it cannot act as collateral estoppel as to the pension disability claim based upon a psychiatric disability. I'm trying to help you out here. In that case, I adopt what you've just said. Let me get back to the 2008 and race judicata on the 2008 case, because this raises a very serious question, particularly in light of compulsory joinder as the background under Michigan law for this type of preclusion principle. And that is Mr. Smith made the request for a pension benefit in January of 2011. The 2008 case went to trial on January 24th of 2011 and one week later resulted in a jury verdict. Now, the simple fact is, as the defendants have acknowledged in their briefs in the district court, his request for a pension benefit was not denied by the defendants until the summer of 2011. Now, that happened to be about six months after the jury had rendered its verdict in the 2008 case. I think one of our concerns is that it would have been nice for purposes of judicial economy if all the claims that had accrued or could accrue or could be raised were all put in one proceeding. But here, the application for disability pension benefits was filed after the trial in 2011, and that's within the time frame for requesting it, I assume, that he wasn't required to file for it within six months after leaving employment or... No, there's no claim on that. I'll just correct you in a minor way. The actual application was made about 20 days before the trial. He was asked to resubmit it, but the point is, he's not suing for applying for pension benefits. He's suing because they were wrongfully denied, and the denial did not come until the summer of 2011. I know, but he wasn't required. Is there a time frame for applying for the benefits? Never been claimed. Never been claimed that I know of. Certainly not in this case. It would be helpful if there had been a time frame of six months or a year, so when you're doing all these other claims, the claim for disability pension benefits would also be in front of the same tribunal. If you don't have a time frame, you have this situation where you have one claim resolved, and then another claim resolved, and then another claim resolved, and it doesn't help the judicial economy, that's all. But the point is, and I've cited the cases from both Michigan and this court, including cases from this court applying Michigan law, it's a question of ripeness. If the case is not ripe, it cannot be compulsorily joined. There was no way, when the case actually went to trial in January of 2011, for Mr. Smith to join a case for the wrongful denial of pension benefits that didn't occur until six months later. Because he hadn't applied. That's correct. That's correct. But he couldn't join it. It was impossible. The defendants have raised one other point regarding this, which is a little off topic, but I have to talk about it. He sued in the 2008 case for constructive discharge. Because constructive discharge was one of his claims, he introduced evidence of an economist who testified to the fact that the constructive discharge had an impact on his pension, his future pension. The jury then awarded him $700,000 for the retaliation or discrimination. Now, the fact is, the defendants are now suggesting that because pension benefits were an item of damages in his 2008 case, there is some conflict here between that and what's happened in this case. Race judicata is a principle based on claims. It is not based on types of damages. The fact is, if, in point of fact, there is an overlap in the damages, under Michigan law, that is factored into something called a set-off. And in fact, that's what was raised in the trial court, that there was some sort of overlap in the damages. They can argue set-off. They're going to have a little bit of difficulty in light of the jury verdict, I can tell you. But the fact is, that's where this overlap, potential overlap, comes in in Michigan law. It is a set-off. It has nothing to do with the question of whether a claim is barred, and that's what race judicata is about. Now, let me just talk very briefly about the last issue, because the last issue involves mostly the pension fund. The trial judge ruled in his original decision, first denying the motion for summary disposition, that the 1983 case against the pension fund survived. He did so on the basis of his conclusion that there are questions of fact of whether the board has ratified the city's unofficial custom and policy of discriminating against African Americans and retaliating against employees for engaging in protected activity. That was the basis for his keeping the pension board in. He then decides, he has made, the district court made this into what is a discrimination retaliation case, sort of a secondary discrimination retaliation case against the board. I don't know if that's what the defendants asked him to do, but that's what he did. And then he ends up dismissing it on reconsideration. He dismisses it on reconsideration because there's no property interest shown. He turned this case, whether it was that, before his original decision, he turned this case into a discrimination and retaliation case against the board. That's what I was reacting to when I wrote this last issue in my brief. It may be confusing, it's certainly confusing to me, but that's what he did in this case. What has happened with the application for retirement benefits? Has it been completed? There was a point where parties were waiting for a third medical professional to give an opinion, I guess. Yes. I think fingers are being pointed as to who's at fault for it not happening. And I don't want to say something that they're going to get upset about, so I'll try to be as... Well, whatever's in the record and whatever arguments you have. The fact is what my client saw was tremendous foot dragging. There was tremendous resistance to naming a third actor, as you understand, and basically he gave up on the process, in essence, I think. It didn't, I don't, but there is an official denial. Let me say that. Thank you. There is a denial. There is a denial. That's correct. So... That came in the summer of 2011. Okay. Thank you. Good morning, judges. My name is Chuck Rudy. I represent the city of Inkster. With me today is Ms. Van Dyke, who represents the pension board. And we have agreed that we would share the time. I guess you have to do it in whole minutes. I'm going to take eight minutes, and Ms. Dyke will take the balance. This matter has been, I believe, exhaustively briefed. In our briefs, we've talked about Michigan's law of res judicata, which is very clear and, in the words of the Michigan Supreme Court, very broad. It is broadly construed to require that every claim that arises from the same transaction must, using reasonable diligence, be brought in the first proceeding. And the reason, this is not a rule to trick people or to trip up litigants or whatever. This is to promote what your honors have mentioned several times here, and that is judicial economy. We have been litigating with Mr. Smith now since 2008, and the litigation goes on. So we've also talked about what transaction means, what due diligence means. And due diligence was certainly not pursued in this case when someone waits for two and a half years to file a disability claim. Is there a time limit to file? There is no time limit. There could be, I suppose. It could be a term in your pension plan that you have to file within six months or a year. But if you don't put a time frame in there, why do they have a duty to file? Let me try to explain what I believe happened in this case. And that is we have a personnel decision in June of 2008 that's not disputed by anyone. From that personnel decision, certain damages resulted in the opinion of the plaintiff. Now the plaintiff then filed a lawsuit in 2008, September, that went to trial in January of 2011. As part of those damages, although it wasn't mentioned in Mr. Granzato's brief, there was a claim for pension benefits. There was an expert witness endorsed, and there was a trial exhibit 39. Now what happened was an expert, his role, he sees it, I'm sure, is to come up with that measure of damages that results in the highest number for his client to claim it. That is exactly what is done here. There are two ways in which pension benefits could be sought in that first trial. The way that was selected by the expert and pursued by the plaintiff was, I want 100% of my lost wages and benefits until normal retirement age, age 65. And then I want the difference, the loss of my normal pension from 65 until I decease, and also for my wife. Now that's in the original case that was litigated? I'm sorry? It was in the case that was litigated? Absolutely litigated. That was claimed in the complaint. It was described by the expert, the plaintiff's expert, in his testimony, and it was the subject of a trial exhibit, exhibit 39, which is part of the record. The problem is, I mean, you're talking about damages. And Mr. Gonzato is totally correct that if you have damages of the same damages, you're entitled to a set-off of damages. It doesn't mean you're litigating a claim because the damages might be somewhat the same or overlapping. The law is very clear, is that claim includes various theories of recovery. This is exactly what it is. Did they make a claim of a denial of disability pension benefits in the 2008 case? Could he have? Did they? I'm sorry. I didn't hear you. Did they make the claim of denial of disability pension benefits in the 2008 case? They chose not to assert a claim for a disability pension. They chose to go after it. Well, they hadn't applied, and it hadn't been denied. So I don't know how you could file a claim for denial of benefits that hasn't even been denied. They hadn't claimed a normal pension either. Okay, so the claim is not litigated in 2008. Are you saying it was tried anyway? I mean, what is your argument? It could have been claimed? Absolutely. Absolutely it could have been claimed. Well, you can't claim it until you have an administrative denial. I mean, it's a failure to exhaust administrative remedies, right? That issue was raised by the pension board in a separate motion in the district court. They said, Mr. Smith can't proceed because he has not exhausted his administrative remedies. Judge Drain said, absolutely not. He's exhausted his administrative remedies by going to the EEOC and getting a right to sue letter. That's all that's required. He was not required to get a denial from the PFRS before filing a claim. When he went to trial in 2011, he had a choice. I want lost pension benefits. Now, which measure of damages gets me the most dollars? I can seek a normal pension, 100% of wages to normal retirement, then lost pension, or at that point I could sue for a disability pension. But that only gives me 50% of final average compensation from the date of injury. So clearly the theory that he pursued resulted in a larger damage claim. It was a tactical choice made by trial counsel and their expert. They absolutely could have asserted a claim for a disability pension. Did the trial judge give the jury any instructions about damages that mentioned anything about disability, pension, et cetera? No, the instructions? Instructions, yes. Anything stated about that? I'm not aware of any damage instruction that's specifically related to disability pension because the theory that was put forth by the plaintiff was that I'm entitled to a normal pension. And you can't get a normal pension and a disability pension. They're alternatives. Any instructions about pensions at all? Yes. To the jury? Well, it was included in the damage calculation. The jury was asked to calculate if there was a lost wages claim and a lost pension claim, and they came up with a number. What calculation they used is secret and in the jury room. I don't know what it was. And the lawyers argued it to the jury. The argument to the jury about damages was, if said I'm entitled to damages that consist of the following, one of which. Yes. The Exhibit 39 was explained by the expert to the jury, and he explained how this plaintiff should be entitled to lost wages until age 65, and then the description of the normal pension benefit that he lost was also put in front of the jury, and then they took those figures and somehow came up with their $700,000. What kind of figures was he arguing for when he argued to the jury about the pension? Absolutely. What did he say? How much did he say that he was entitled to? Did he say? I believe the total was $1.3 million, and the offhand, I'll be honest with you, I don't know offhand here without going back to the record what the breakdown was, but that's set forth in Exhibit 39, which is part of the record, because the total wage claim was at the bottom, and then the total lost benefit claim was at the bottom. Your bottom line is it's clear that the jury awarded something having in mind the pension. We have to conclude that they did, that that was what the claim was, and then they came up with $700,000. They didn't give him every penny that he asked for, but how they came up with that number I can't tell you, but that certainly was presented to them, and that was part of the ruling. Thank you. All right. Mr. Rudy, I mean, would you concede that the Judge Drain aired in his collateral estoppel ruling regarding the workers' compensation proceeding when it's quite clear that the workers' compensation magistrate based his ruling solely on the heart condition and not the psychiatric condition? I mean, that's right. I don't think that's clear from the magistrate's point of view. I think it's very clear that although there was psychiatric evidence presented, that there was no ruling on that. If you look at the law of collateral estoppel that we've set forth in our brief, that a party is required to bring forth all evidence and all claims that existed at that time. You're talking about raising a collateral estoppel as issues that are actually litigated and adjudicated, not that could have been raised. You're confusing the two. The magistrate's ruling is not the epitome of clarity on that. I think it is. I mean, I can read it to you. I think there was definite reference in his opinion. Plaintiff testified further that the psychiatrist was keeping him off work because of a mental condition, which has not been alleged. And although these conditions, psychiatric conditions, may be disabling, there was... I believe they said no evidence of work connected. Yeah, well, it wasn't at issue, and he's saying, I therefore don't rule on that. And I'm ruling on the heart condition, and I don't think it can be clearer. He says there's some evidence of psychiatric problems. But I have no ruling on it. So if there's no ruling, you can't have collateral estoppel. I think there was a ruling by the magistrate that said the plaintiff, the claimant, has failed to put in evidence of work-relatedness. So in that sense, there was a ruling that they had an obligation to put in evidence of work-relatedness and failed to do so, and that that's the basis of their ruling. I'll let Mr. Gonzato respond to it. Thank you. Okay, thank you, Mr. Rudy. Ms. Van Dyke? May it please the Court. Good morning, Your Honors. Katie Van Dyke, appearing on behalf of the appellee, the Defendant Pension Board. Before I get into my argument, there was a question by the Chief Judge as far as what happened with the application and where was the process. And there is a dispute as to why there was a delay. And admittedly, looking at the record, it just looks like two doctors were butting heads and they both were proponents of their own doctors. We have testimony in the record from Mr. Smith's appointed doctor under the charter where she stated, and this is at page ID 3056, she stated that she was told by him not to accept any doctor ever proposed by the board because he did not trust them. And so the third doctor was never appointed, which is required under the charter. And instead, Mr. Smith filed a lawsuit. During the lawsuit, and this is not in our brief on appeal, but it is on the record, during the lawsuit I attempted to revive the process and have the third doctor appointed. We filed a motion with the district court in order to do so to try and complete the process under the charter. Because there had been no ruling, quite honestly, and the board had testified. If a third doctor said he was entitled to these benefits, at the time they would have given it because they didn't know about the prior trial. They didn't know about the jury verdict. That's when the city has brought that issue to light during this proceeding. So the board at the time was willing to give him his pension benefit if the third doctor said he was disabled. And what ended up happening is that Mr. Smith denied to go through the process, and we were ordered to facilitate with the magistrate judge, and the magistrate judge could not get the third doctor agreed upon or selected. I later deposed Mr. Smith on that issue, and it's in Record Entry 95. And it's in his deposition transcript at 153, and it's page ID 3052. And I said, today, as we sit here, will you agree to be seen by the third physician under the charter? And it was an unequivocal no, I will not. Well, do we have a final denial from the board? The denial stands. It would be the... About the... Exactly. Third. Yeah. The board didn't send a letter saying, because you're not going through the process, we're going to deny you again. It's the denial from the fall of 2011 just stood on its own then. And so that... There was an initial denial before. Explain that to me, because I thought there's got to be a denial for the physicians to get involved.  No, what happens under the charter, the charter requires that each side has its own appointed doctor. We did that. We did that. And actually, we did it twice. The board did. They cut the side on the third. So when did the denial come through? The denial came through because when... When? Based on... When? Oh, it first came through. There are two parts of the denial process. The first denial came through when the board's IME doctor said he wasn't disabled. Okay, so after the employer's own doctor said he wasn't disabled, a denial was issued. Exactly. Then Mr. Smith's physician, he submits a report to the contrary, and at that point the denial is pulled? It stands? His physician never submitted a report. What his physician did was sent a letter in as part of the application process. Okay, when that happens, does the denial continue at that point? No, under the charter, once he submits a letter from his physician saying that this is part of the process and I'm applying for benefits because I have this duty disability, the next step under the charter is for the board to have its IME doctor then determine if he has a duty-related disability. And because the board's doctor did not do so, they voted and they denied his benefits based on their IME doctor's report. They also voted to then send him through the process for the third physician under the charter at that time. Now, if this went before a magistrate, why didn't the magistrate appoint a third physician if the parties could not agree? It seems like that's what normally happens. It was part of the facilitation process with this lawsuit. I know, but why wasn't there a... You know, it's a little unclear to me. I feel like the court decided that it didn't have the authority to appoint the third physician at the time. That was my understanding of it. The court said that if you want to have him go through an IME for purposes of emotional distress and damages in this case, you're free to do so, but we can't appoint the third physician under the charter. The charter is... Okay, it doesn't specify what happens when the two parties cannot agree on a third physician? No, it does not. It's unclear. I mean, it says nothing about it. This is a charter from 1964. They're still working off of that. So there's nothing that says if they can't agree, this is the next step. It's just, you know, the next step is appoint a third physician and see whether or not they come up with a disability. What the board ended up doing, though, and it is part of the record, is that there is a comparator. There is a gentleman, a police officer from 2005, who is white, who complained of PTSD, and the board actually did grant him benefits. And so Mr. Smith's claim that this is race-related and he was denied equal protection of the law fails. First and foremost, our argument is that he waived that argument on appeal. But secondly, the only other person that the same board saw with PTSD or a mentally-related disability, they granted him benefits. And so during Mr. Smith's application process, the board's attorney said to him, that doctor that found the other gentleman disabled, we're fine if you go to him as the third physician. We're okay with that. And he refused. Counsel, if he's not entitled to disability benefits, is he entitled or ever entitled to old-age pension benefits? He is, yes. He's still entitled to retirement benefits, yes. And that, but he has reached or has not reached the age? Correct. Has not reached. Has not. He has, so under the charter, you are entitled to retirement benefits when you hit the age 60 if you're currently employed. Because he had stopped working in 2008, the 25-year rule kicks in. That's my understanding. And so he's not entitled to retirement benefits until he passes that 25-year mark. Your supposition is he's not entitled to any disability benefits and he's not of an age to be entitled now at the present time to any old-age benefits. Correct. The board will, once he hits that eligibility, the board will provide him with the retirement benefits. So thank you. Thank you. To respond, Judge Griffin, to your inquiry, page one of the magistrate's decision was cited on page 45 of my brief. It's page ID number 1254. It sets out exactly what the very first page, what the magistrate in the workers' compensation proceeding was going to decide and what was being alleged, was that a physical exertion as well as physical and emotional stress related to plaintiff's employment caused a cardiac disability. That was the nature of the claim that was, in fact, litigated in the workers' compensation. What you read, Mr. Rudy, was from page 29, and that's the conclusion, basically, of the opinion, reinforcing the fact that that was, in fact, the only issue that was presented. Now let me just close by stressing one thing that I think should be self-obvious. The suggestion has been made here that we are here making a claim for pension benefits. If I were in a court making only a claim for pension benefits, I would not be in the Sixth Circuit or the Eastern District of Michigan. He's not entitled to old-age benefits. Well, I do not know if he is entitled. He claims that he's still entitled to old-age benefits when his age gets to the point here at 25 years, and I would take her at her word because, you know, your guy may be entitled to those benefits. I understand that, and I'll tell you this. She knows much more about it than I do, so I will take her word as well. But the fact is it's not a case involving just a claim for pension benefits. It's a case for the wrongful denial of those benefits, in fact, a discriminatory denial, a retaliatory denial. You're talking about only disability, right? Disability, that's correct. Disability pension. But the point is the denial, the wrongful denial, didn't occur until the summer of 2011, and since it didn't occur until the summer of 2011, it couldn't be joined with a case which reached a jury verdict in January of 2011. That's the essence of this case. And the suggestion that's been made here, that somebody has an affirmative duty, forget about statute of limitations or anything else, an affirmative duty to present themselves for discrimination, to be discriminated against, would be a new era of race judicata law. That is not what the Michigan courts have meant when they say, was made or could have been made. The fact is this allegation with respect to wrongful denial of pension benefits could not have been made... If we were to agree with you and rule that Judge Drain erred in his collateral estoppel and race judicata rulings, we would reverse and remand for further proceedings? Correct. And what would happen on the further proceedings? Well, one of the things that would happen is they'd get to litigate their set-off issue. That's one of the things that would happen. Litigate what? Their set-off issue. Set-off. Because that's what they're claiming with respect to damages. And then we litigate the pension benefits as well as the retaliation? Yes, and I assume at this stage, obviously the benefits themselves are only one aspect of the damages involved, because obviously there are damages involving emotional upset that would be recoverable, it seems to me, at least certainly under the 1983 claim. How long before this guy would be entitled to the old-age pension? How many years? I will defer to the person who knows. You may not know. I don't know. Okay. I'm sorry. Thank you. He reaches 65 in two years. Okay. Thank you, counsel, for your arguments today. We appreciate them. The case will be submitted.